[Cite as *State v. M.L.D.*, 2016-Ohio-1238.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 15AP-614 |
| v. | : | (C.P.C. No. 14CR-3477) |
| [M.L.D.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 24, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Yavitch & Palmer Co.*, *L.P.A.*, *Keri Lynne Collin*, and *Stephen E. Palmer*, for appellant. **Argued:** *Keri Lynne Collin.*

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, M.L.D., appeals from the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a bench trial in which she was found guilty of one count of felonious assault, in violation of R.C. 2903.11, a second-degree felony.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The charge against appellant arose from a violent altercation between two mixed groups of adults and teenagers that began in the parking lot of Reynoldsburg High School and continued to the street and front lawn of a nearby residence on Redwood Avenue, Reynoldsburg, Franklin County, Ohio. The indictment contains a single count of felonious assault in that appellant "did knowingly cause or attempt to cause physical harm

* * * by means of a deadly weapon or dangerous ordnance * * * to wit: a motor vehicle and/or baton." The indictment specifies that the victim, like appellant, was an adult woman, S.B. The two women are parents of teenage daughters, and a rift between the daughters appears to be at the root of the eventual violence.

{¶ 3} After extensive testimony from eyewitnesses, including responding police officers and review of dash-cam video from a police cruiser and two school surveillance locations, the court rendered its verdict and sentenced appellant to a three-year term of incarceration. She has timely appealed.

## II. ASSIGNMENTS OF ERROR

{¶ 4} Appellant assigns the following errors for our review:

[1.] TRIAL COUNSEL'S FAILURE TO ASSERT THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE AND DEFENSE OF OTHERS RESULTED IN APPELLANT'S CONVICTION AND DEPRIVED APPELLANT OF HER SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

[2.] THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

[3.] THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY, AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[4.] THE TRIAL COURT ERRED BY NOT STATING SPECIFIC REASONS FOR ORDERING A NON-MINIMUM FELONY SENTENCE, THEREBY VIOLATIING HER DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONTITUTION [AND] COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

## III. DISCUSSION

{¶ 5}   We will address appellant's assignments of error out of numerical order, beginning with her third assignment of error, which asserts that the verdict is against the manifest weight of the evidence heard at trial.

{¶ 6}   "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶ 7}   The finder of fact at trial is in the best position to weigh the credibility of testimony by assessing the demeanor of the witnesses and the manner in which they testify, their connection or relationship with the parties, and their interest, if any, in the outcome.  The finder of fact can accept all, part, or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact and whether it is merely evidential or tends to prove the ultimate fact.  *State v. McGowan*, 10th Dist. No. 08AP-55, 2008-Ohio-5894, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 8}   When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.  *Thompkins* at 387.  An appellate court should reverse a conviction as against the manifest weight of the evidence in only the most "exceptional case in which the evidence weighs heavily against conviction," instances in which the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 9}   After independently reviewing the evidence and bearing in mind the trial court's superior, first-hand perspective in judging the demeanor and credibility of

witnesses, we cannot conclude that the trial court "lost its way" by finding that the state's evidence supported conviction. *Id.*

{¶ 10} The indictment charged appellant with felonious assault, a violation of R.C. 2903.11(A)(2), in that she knowingly caused or attempted to cause physical harm to another by means of a deadly weapon or dangerous ordnance as defined in R.C. 2923.11. Based on the evidence, the prosecution described the deadly weapons as the use of appellant's automobile to strike the victim and the use of a metal baton or club to strike the victim.

{¶ 11} The state first presented the testimony of the victim, S.B. S.B. testified that on May 28, 2014, she lived on Redwood Avenue, a street adjacent to the parking lot of the high school. S.B.'s daughter, R.B., and appellant's daughter, M.D., were classmates in the eighth grade. On the afternoon in question, S.B. returned to her home from work in the afternoon. Shortly thereafter, her daughter entered the house in a frantic state and complained that M.D. and M.D.'s friend, D., a girl of similar age, had chased her with police-style "night sticks." (Tr. 21.)

{¶ 12} S.B. went to the door of her home and observed M.D. and D. running with club-like objects in their hands through the school parking lot. The girls ignored S.B.'s demand that they stop what they were up to, so S.B. chased them on foot and caught up with them in the parking lot. She approached the girls and "started fussing at them." (Tr. 21.) She told the girls to quit coming to her house and trying to fight her daughter. The girls were not compliant and began "talking trash." (Tr. 22.) S.B. attempted to call police but her phone was dead, so she turned to walk home, and at the midpoint as she crossed the parking lot, she heard a car and saw appellant coming toward her in her van. As S.B. turned to face the vehicle, appellant drove "straight into" her and struck her. (Tr. 22.) S.B. could not run effectively because she was holding her five-year-old daughter's hand. Appellant then circled S.B. with the van, hitting S.B. repeatedly.

{¶ 13} Appellant then stopped the van and got out with a metal baton and began striking S.B. with it. M.D. and D. joined in the assault while R.B. attempted to pull them off S.B. Appellant re-entered the van and drove from the school lot, striking S.B. one more time and almost striking S.B.'s two-year-old son. S.B. returned to her house, where neighbors attempted to stem the flow of blood from her head by applying towels. S.B.

then observed that a police cruiser had arrived at the scene, parking directly behind appellant's van, which was now located in front of S.B.'s house. Appellant, D., and M.D. again began attacking R.B. S.B. interrupted her brief conversation with the newly-arrived officer and again ran to her daughter's aid. She punched appellant and then they both fell to the ground under the effect of police pepper spray, effectively ending the fight.

{¶ 14} S.B. further testified by observing and describing for the court the events depicted on a surveillance video covering the school parking lot. She identified the various parties and their actions and described events corresponding to her testimony. She was then given the opportunity to do the same for the police dash-cam video taken from the first cruiser on the scene at the second phase of the fight, in front of her house on Redwood Avenue. She also identified in court two batons secured by police at the scene and stated that these resembled the ones used to strike her.

{¶ 15} S.B. next described the nature of her physical injuries. She identified and described photographs taken of her after the fight. She stated that these showed bruises, welts, and contusions from blows to her head, as well as a bite mark to her face. She stated that after the fight, she was taken by emergency squad to Grant Medical Center. Medical personnel stopped the bleeding from her worst head wound and applied a neck brace. S.B. was dizzy, disoriented, "couldn't think straight," and in "a lot of pain" at the hospital. (Tr. 40.) She also suffered bruises to her knees and legs where the van struck her.

{¶ 16} Despite her condition, S.B. left the hospital on the evening of the assault so that she could return home to care for her children. She declined to wait for further treatment that night, including stitches for her head wound. Later, she underwent therapy because she had difficulty walking. Because of her injuries, she has not worked regularly since the fight. S.B. closed her testimony on direct examination by stating that at no time in the incident was she armed and that she did not initiate the confrontation with the girls in the school parking lot with any intent of starting a physical fight.

{¶ 17} Plaintiff-appellee's, State of Ohio, next witness was Sergeant Lawrence Finkes, a 27-year veteran of the Reynoldsburg Police Department. On the day in question, he responded to a dispatch indicating a disturbance in the parking lot of the high school. On arriving, he observed several vehicles driving much too fast in the school lot. Several

persons were also running from the scene, confirming Sergeant Finkes's belief that a large fight was in progress. He followed a white van, later identified as appellant's, to the nearby street while another responding cruiser pulled over a different vehicle.

{¶ 18} As soon as the van stopped, the occupants exited and began fighting another group of women in front of the van. The altercation quickly drew onlookers, and as the crowd was growing and the combatants were completely unresponsive to police commands, Sergeant Finkes deployed his pepper spray on all involved. He then called additional units to keep the parties separated and for medics to assist those who were reacting badly to the pepper spray. EMS personnel arrived quickly, and Sergeant Finkes had a brief conversation with S.B. before she was taken to the EMS vehicle for treatment. S.B. stated she had been assaulted in the parking lot and then run over by the white van that Sergeant Finkes had pulled over.

{¶ 19} Once the parties had been separated and somewhat calmed, Sergeant Finkes secured the scene as best as he could and gathered physical evidence, primarily by impounding appellant's van. He was particularly interested in preserving the van as evidence because he had observed blood on the exterior of the vehicle. He then contacted school officials to obtain copies of the school parking lot surveillance video.

{¶ 20} The state then presented the witness with the collapsible metal batons used in the altercation. The defense stipulated that these were the batons recovered at the scene from appellant's van. Sergeant Finkes described them as police-style batons to be used when a person strongly resists arrest or in defensive situations requiring physical force. Sergeant Finkes specified that, pursuant to his training, the collapsible batons could be used in various submission holds and pressure point applications and should not be used to strike a person in the head unless it was a life-threating situation where deadly force would be justified to protect the officer.

{¶ 21} On cross-examination, Sergeant Finkes confirmed that although he had requested that S.B. furnish her medical records from Grant Medical Center as part of the investigation, she failed to produce them with respect to her first hospital stay at Grant on the day of the incident and could only furnish them for a visit two days later to Mount Carmel Hospital. Under further cross-examination, Sergeant Finkes stated that his initial assessment of both the school parking lot video and his own dash-cam video did not fully

support S.B.'s account of the incident. He specifically conceded that the initial part of the school video depicts S.B. and her daughter, R.B., running from their home toward the parking lot and confronting D. and M.D. Sergeant Finkes observed that one discrepancy involved S.B.'s claim to him in interviews that she had been "run over," whereas the school video disclosed that she had been struck but the vehicle did not physically pass over her body. Sergeant Finkes also confirmed on cross that when he arrived at the Redwood Avenue location and spoke to S.B., she broke away from him immediately and joined the fight taking place in front of appellant's van.

{¶ 22} The state next called S.L.R., who testified that she resided on Redwood Avenue on May 28, 2014. She knew her neighbor, S.B., by sight but had only a nodding and waving acquaintance with her. On the day in question, S.L.R. returned from work and saw many people gathered in the parking lot of the high school. At first, it seemed the gathering was comprised mostly of young teens and children, but then a white van pulled into the parking lot going too fast and began driving in circles around a group of people. A very young child in the group was screaming as the vehicle circled, and it appeared that the child could not safely break away from the group.

{¶ 23} At that time, a young man came from S.B.'s house and walked toward the parking lot. He appeared to observe the car going around the children and was trying to rescue the younger child. The van was moving fast enough that S.L.R. could hear the tires screeching. The van hit S.B., who went flying onto the hood and then fell back to lie on the ground.

{¶ 24} After a minute or two, S.B. got up, whereupon the occupants of the car exited and began beating her. The van then left the parking lot and S.B. began walking toward her home. S.L.R. went home and got her first aid kit and offered assistance. Using a rag, S.L.R. began to get blood cleaned from S.B.'s face. As S.L.R. attempted to treat S.B., initially S.B. appeared disoriented and was "gushing blood" from her head. (Tr. 97.)

{¶ 25} S.L.R. then heard tires screeching in the street. S.B. ran out of the house toward a white van parked in front of S.L.R.'s driveway. The same individual with two younger girls again exited the van and began another fight in the middle of the street. The

No. 15AP-614

two girls were fighting S.B.'s daughter, R.B., and the older women were initially some distance away, fighting each other.

{¶ 26} The next witness for the prosecution was Officer Craig Brafford of the Reynoldsburg Police Department.  On the day in question, he was called to collect evidence, including blood splatter evidence from a white Town and Country mini van at the scene of a fight on Redwood Avenue.  He collected blood samples with cotton swabs and submitted them to the Ohio Bureau of Criminal Identification and Investigation crime lab.  The crime lab returned a report matching the blood to S.B.  Officer Brafford identified photographs of a van showing the blood stains and authenticated the general appearance of the stains.

{¶ 27} Officer Brafford further testified that he also collected two expandable metal batons from inside the vehicle.  He made a courtroom identification of the batons and stated that he was familiar with their use.  Departmental policy in Reynoldsburg was to employ the batons in "joint manipulation" or by striking major muscle groups, including the upper shoulder area.  (Tr. 118.)  Policy prohibited use of the batons against a person's head, which would be deadly force in self-defense and employed by an officer as a last resort when confronted with deadly force.  On cross-examination, Officer Brafford conceded that he had not visually observed blood on the batons, nor tested them for blood.  He also confirmed that when searching appellant's van, he found two civil protection orders against R.B. issued in Franklin County the day prior to the incident but not yet served.

{¶ 28} After the state rested, the defense moved for a Crim.R. 29 dismissal based on the lack of credibility of the victim witness and a lack of corroboration of her story by the police and parking lot surveillance cameras.  The trial court overruled the motion.

{¶ 29} Appellant testified on her own behalf.  She testified that on the day in question, she received a "frightening" phone call from her daughter, who was screaming and stated that R.B. and her mother were fighting with her.  (Tr. 132.)  Appellant ran to her car and began to drive to the school parking lot while calling 911.  She first drove to the wrong school.  When she eventually arrived at the high school, she saw young people gathered in the parking lot.

{¶ 30} Appellant saw S.B. chasing appellant's daughter, M.D., and tried to catch up with them in the van. She then drove around the parking lot and tried to place her van between S.B. and M.D. Appellant thought that S.B. would jump back as the car approached but instead S.B. put her hands on the hood of the vehicle after the vehicle had stopped. Appellant then exited the vehicle, fearing for M.D. and D. because a crowd of hostile people had gathered. She grabbed a baton from D.'s hand, feeling threatened by S.B. who had assumed a fighting stance. Appellant hit S.B. after being punched by S.B. in the face. S.B.'s boyfriend then grabbed the baton from appellant, and appellant and S.B. then fought with their bare hands. S.B.'s boyfriend also struck appellant at this point. The parties then separated and S.B.'s boyfriend gave appellant back the baton, somewhat to her surprise as she initially thought he was going to hit her with it. As appellant and M.D. got back in the car and drove away, M.D. pointed out that appellant's phone was missing.

{¶ 31} At this point in the testimony, appellant's 911 call was played in open court. In the call, appellant states that police should come to Reynoldsburg High School because a woman was assaulting her 13-year-old daughter. Appellant was then given the opportunity to view the school security video and describe the events depicted. She stated that as the fight progressed to the Redwood Avenue area, S.B. at one point attempted to rub a rag covered in an irritating substance in appellant's face.

{¶ 32} On cross-examination, appellant stated that after arriving in the parking lot, she witnessed S.B.'s daughter, R.B., chasing her daughter M.D. and swinging at her. Appellant denied seeing a two-year-old child in the parking lot. She insisted she obtained her baton from M.D.'s friend D. and did not have it with her when she arrived at the scene.

{¶ 33} The defense also called R.F., currently married to appellant. He was present in appellant's home when they received the phone call about young people fighting in the high school parking lot. He left the house shortly after appellant and arrived in his own vehicle. When he arrived at the high school, appellant and M.D. were saying that S.B. and S.B.'s boyfriend had struck them. The situation then moved to the street in front of S.B.'s house, where another fight ensued. The police pepper sprayed all those involved in the fighting.

{¶ 34} Appellant asserts that the above evidence presented at trial did not support conviction because S.B. did not suffer "serious" physical harm as defined by R.C. 2903.11(A), that her actions were justified because she acted in self-defense, and that her actions were justified because she acted in defense of M.D., who was the object of a physical assault.

{¶ 35} With respect to the severity of the injuries suffered by S.B., S.B.'s testimony, if believed, supports the conclusion that appellant inflicted serious physical injuries by striking S.B. with her car, in the head with a baton, and possibly inflicting bite wounds. Moreover, under the version of felonious assault given in the indictment, the state was only held to prove that appellant *attempted* to cause physical harm by means of a deadly weapon. R.C. 2903.11(A)(2). The degree of injury suffered by S.B., while well-substantiated, is relevant only insofar as it corroborates appellant's attempt to knowingly inflict physical harm with the requisite type of weapon.

{¶ 36} Under R.C. 2923.11(A), "deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, *or possessed, carried, or used as a weapon*." (Emphasis added.) Although not expressly as such, "[w]hen an automobile is used in a manner likely to produce death or grave bodily harm, it can be classified as a deadly weapon under R.C. 2923.11." *State v. Bandy*, 7th Dist. No. 10 MA 74, 2011-Ohio-4332, ¶ 22, citing *State v. Tortarella*, 11th Dist. No. 2002-L-147, 2004-Ohio-1175, ¶ 64; *State v. Allsup*, 3d Dist. No. 6-10-06, 2011-Ohio-405, ¶ 23. This is true because a car is a large and heavy instrument that is fully capable of inflicting death or serious bodily injury, even if traveling at a relatively slow speed. *Bandy* at ¶ 23; *see also State v. Taylor*, 5th Dist. No. 12CAA020007, 2012-Ohio-5029; *State v. Hudson*, 7th Dist. No. 11 MA 130, 2012-Ohio-5614. "When determining whether an automobile is a deadly weapon, a court should consider the intent of the user, the nature of the weapon, the manner of its use, the actions of the user and the capability of the instrument to inflict death or serious bodily injury." *State v. Evans*, 10th Dist. No. 01AP-1112, 2002-Ohio-3322, ¶ 22, citing *State v. Gimenez*, 8th Dist. No. 71190 (Sept. 4, 1997).

{¶ 37} The evidence, if believed, established that appellant deliberately maneuvered her vehicle at excessive speed around the school parking lot, amidst a crowd

of persons including very young children, and at least twice struck her victim with enough force to inflict trauma and leave blood smears on the van. When a person drives a vehicle directly at a plainly visible pedestrian and fails to stop or change direction despite the opportunity to do so, the intent to knowingly inflict physical harm may be inferred. *Hudson* at ¶ 26 (defendant drove car directly into group of police officers on foot, who only avoided being struck by leaping aside).

{¶ 38} The evidence also establishes that appellant struck S.B. in the head with a baton. Two different law enforcement witnesses testified that, pursuant to department policies, striking an individual in the head with a metal baton of this type constituted deadly force to be used only when justified. This court has specifically held that a metal baton used to inflict blows to the head may satisfy the deadly weapon element of felonious assault. *State v. Logan*, 10th Dist. No. 08AP-881, 2009-Ohio-2899, ¶ 20-23.

{¶ 39} Viewing these factors under a manifest weight standard of review, we find that the state presented ample evidence to support a conviction for felonious assault based on the knowing infliction of physical harm by use of either type of deadly weapon. We therefore find that the trial court's verdict is not against the manifest weight of the evidence in this respect. Under a manifest weight challenge, the mere presence of conflicting evidence does not establish that the evidence presented could not support a conviction. *State v. Samatar*, 10th Dist. No. 02AP-180, 2003-Ohio-1639, ¶ 113; *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001).

{¶ 40} We next examine appellant's claims of self-defense or defense of another. Self-defense is an affirmative defense in which the accused has the burden to prove by a preponderance of the evidence. R.C. 2901.05(A). To establish the affirmative defense of self-defense through the use of deadly force, appellant must prove first, that she was not at fault in creating the situation that gave rise to the affray; second, that she had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was the use of force; and third, she must not have violated any duty to retreat or avoid the danger. *State v. Smith*, 10th Dist. No. 04AP-189, 2004-Ohio-6608, ¶ 16. A person may use only as much force as is reasonably necessary to repel an attacker. *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25, citing *State v. Jackson*, 22 Ohio St.3d 281 (1986).

{¶ 41} The standard for defense of another is comparable. *See State v. Moss*, 10th Dist. No. 05AP-610, 2006-Ohio-1647, ¶ 13. A defendant claiming the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense. *Id.*

{¶ 42} The evidence in the present case does not demonstrate error on the part of the trial court in concluding that appellant had failed to meet her burden of establishing by a preponderance of the evidence that she acted in self-defense or defense of another. Appellant used a motor vehicle and a metal baton to inflict injuries on S.B. S.B. testified that to the extent that she responded physically, she used only her bare hands. In response to the initial affray between teenage girls, appellant chose not to retrieve her daughter, which testimony and surveillance video demonstrate to have been possible at various points, and thereafter leave the parking lot but, instead, drove in circles with numerous other persons in the vicinity, striking S.B. at least twice with her van and leaving both S.B. and the vehicle bloodied. Even accepting in its entirety, which the trial court was not required to do, appellant's testimony regarding past bullying incidents and the physical attack on appellant's daughter, M.D., the use of force was not commensurate with those attacks, and appellant's failure to immediately retreat from the parking lot situation was compounded by her decision to drive to the vicinity of S.B.'s home.

{¶ 43} We accordingly find that the trial court's verdict is not against the manifest weight of the evidence either on the basis of self-defense or defense of another, based on the degree of force employed by appellant and the resulting injuries. The verdict is not against the manifest weight on the question of appellant's knowing use of a deadly weapon to inflict or attempt to inflict physical harm. Appellant's third assignment of error is overruled.

{¶ 44} Appellant's second assignment of error asserts that the trial court erred in overruling defense counsel's Crim.R. 29 motion for acquittal at the close of the state's evidence. A Crim.R. 29 motion tests the sufficiency of the evidence, and, accordingly, we apply the same standard of review to Crim.R. 29 motions that we use in reviewing sufficiency of the evidence as a challenge to a guilty verdict. *State v. Hernandez*, 10th Dist. No. 09AP-125, 2009-Ohio-5128, ¶ 6; *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 45} The legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations. *Thompkins* at 386. As to sufficiency of the evidence, " 'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Id.,* citing *Black's Law Dictionary* 1433 (6th Ed.1990). A determination as to whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* When we review the sufficiency of the evidence on appeal, we construe the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. As a result, when we review the sufficiency of the evidence, we do not, on appeal, reweigh the credibility of the witnesses. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79.

{¶ 46} The relevant inquiry on review of the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime [proven] beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reversal based on insufficient evidence has the same effect as a not-guilty verdict because such a determination "means that no rational factfinder could have voted to convict the defendant." *Tibbs v. Florida*, 457 U.S. 31, 41 (1982).

{¶ 47} Under the above standard, we find that the examination of evidence in relation to appellant's manifest weight challenge to her conviction produces the identical result when examining the sufficiency of the evidence before the court at the close of the prosecution's case. Deprived of the limited reweighing of evidence available in a manifest weight challenge, we are left only to construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. For the reasons that support our conclusion that the trial court did not err in its verdict under a manifest-weight standard, we conclude that the trial court did not err in finding the evidence sufficient to overrule a Crim.R. 29 motion for acquittal. Appellant's second assignment of error is overruled.

{¶ 48} Appellant's fourth assignment of error asserts that the trial court erred by not giving specific reasons for sentencing her to a sentence greater than the statutory minimum (two years, R.C. 2929.14(A)(2)) specified for the crime for which she was convicted. The sentencing entry contains the following language with respect to the statutory sentencing factors:

> The Court has considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the factors set forth in R.C. 2929.12. In addition, the Court has weighed the factors as set forth in the applicable provisions of R.C. 2929.13 and R.C. 2929.14. The Court further finds that a prison term is not mandatory pursuant to R.C. 2929.13(F).
>
> * * *
>
> After imposing sentence the Court gave its finding and stated the reasons for the sentence as required by R.C. 2929.19(B)(2)(a)(b) and (c)(d) and (e).

(June 15, 2015 Judgment Entry, 1-2.)

{¶ 49} Appellant's brief on appeal appears to concede that this language used by the court in its entry, in conjunction with the statements of the court at the sentencing hearing, complies with Ohio's statutory sentencing requirements when entering a greater-than-minimum felony sentence, pursuant to the Supreme Court of Ohio's decision in *State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320, as modified by *State v. Bonnell*, 140 Ohio St.3d 20, 2014-Ohio-3177. *See State v. Hargrove*, 10th Dist. No. 15AP-102, 2015-Ohio-3125 (addressing required findings when imposing consecutive sentences). The trial court retains discretion in sentencing, and we may not modify or vacate a sentence unless it is clearly and convincingly contrary to law. R.C. 2953.08(G)(2); *State v. Rivera*, 10th Dist. No. 10AP-945, 2012-Ohio-1915, ¶ 51. The sentence imposed here by the trial court is within the range specified by statute. Furthermore, appellant's brief on appeal confirms that this argument is raised here only to preserve it for subsequent collateral attack on her conviction in federal court. Appellant raising no new argument in support of a reversal on the basis of sentencing, we duly note that the issue is adequately preserved and overrule appellant's fourth assignment of error.

{¶ 50} Finally, we turn to appellant's first assignment of error, which asserts that she did not receive the effective assistance of trial counsel guaranteed under the Sixth Amendment to the U.S. Constitution. In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The defendant must then establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶ 51} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). A verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel. *State v. Hester*, 45 Ohio St.2d 71, 75 (1976).

{¶ 52} Appellant specifically asserts that trial counsel failed to effectively argue the affirmative defenses of self-defense and defense of others, despite the presence of favorable facts and evidence to support those affirmative defenses. When a defendant alleges that counsel was ineffective for failure to pursue an additional legal defense, the actual prejudice prong of *Stickland* presents two components: first, the defendant must prove that the proposed defense was meritorious, and second, the defendant must show that there is a reasonable probability that the outcome of trial would have been different had counsel pursued the defense. *State v. Santana*, 90 Ohio St.3d 513 (2001), citing *State v. Lott*, 51 Ohio St.3d 160, 174-76 (1990).

{¶ 53} As described in our discussion of appellant's third assignment of error, the evidence certainly supports a finding that the situation escalated out of a generalized affray in which the victim took some aggressive action. That evidence, however, does not

rise to a level that would support a finding that the finder of fact would have reached a different outcome if counsel would have presented a more coherent and emphatic self-defense argument. The steps appellant took to escalate and continue the confrontation and the physical means that she used to inflict serious injury on her opponent, including a metal baton and motor vehicle, do not comport with the reasonable-force elements inherent in her self-defense argument. We accordingly find that appellant has not demonstrated that trial counsel was ineffective, and appellant's first assignment of error is overruled.

## IV. CONCLUSION

{¶ 54} In summary, we overrule appellant's four assignments of error and affirm the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and BROWN, JJ., concur.

---