[Cite as *State v. Wallace*, 2016-Ohio-7013.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-145 |
| v. | : | (C.P.C. No. 14CR-6776) |
| Kyle D. Wallace, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 27, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

**On brief:** *W. Joseph Edwards*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Kyle D. Wallace, appeals from a judgment of the Franklin County Court of Common Pleas issued on February 10, 2016, convicting him of one count of kidnapping and sentencing him to serve eight years in prison. Wallace argues that his conviction was not supported by sufficient evidence and that, even if the evidence was sufficient, the conviction is contrary to the manifest weight of the evidence. Because we disagree with those contentions, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On December 30, 2014, a grand jury indicted Wallace for one count of attempted murder, one count of felonious assault, and one count of kidnapping arising out of an incident between Wallace and his girlfriend, Chelsea Cohagen. Wallace pled not guilty on January 2, 2015.

No. 16AP-145

{¶ 3}    Approximately one year later, on December 14, 2015, trial began in Wallace's case.  Six witnesses testified in the case: Cohagen, a neighbor named Courtney Stroud, an emergency room doctor who examined Cohagen, and three officers from the Columbus Division of Police.

{¶ 4}    Cohagen explained that she began a romantic relationship with Wallace in January 2011 and that, after a few months, he moved in with her and her daughter (who was seven years old at the time of trial in 2015).  After a number of different housing arrangements (including living with Wallace's family) in July 2014, the three moved into an apartment complex on the southwest side of Columbus.  At some point during the relationship, they obtained a dog as a pet.

{¶ 5}    On December 23, 2014, Cohagen was preparing to go Christmas shopping.  Her daughter was not in the apartment that day but the dog was.  Wallace, who had been drinking, came into the bedroom where Cohagen was readying herself to go out and asked to use her cell phone. Cohagen told him, "[n]o, you have your own phone." (Dec. 14, 2015 Tr. Vol. 1 at 106.)  Wallace responded, "[y]ou have one or two options.  Either you give me your phone or I am going to put your head through the wall." *Id.*

{¶ 6}    Perceiving that Wallace could be serious, Cohagen rushed to leave but, after she opened the outer door of the apartment, she realized she had not yet donned shoes.  She returned to the bedroom to retrieve shoes but paused to tell Wallace, "I don't know who you're talking to like that." (Tr. Vol. 1 at 107.)  Wallace became enraged at that remark, grabbed her, wrestled her to the ground, and "wouldn't let [her] go." (Tr. Vol. 1 at 108.)

{¶ 7}    Once he had her on the ground he grabbed the back of her shirt and pulled, strangling Cohagen with her own shirt.  Cohagen's testimony was unclear as to the exact positioning of the two during this choking incident.  She testified that her back was on the ground, but also that Wallace choked her by pulling the back of her shirt.  However, she was clear in her testimony that she lost consciousness.

{¶ 8}    When she came to, she asked Wallace to please stop hurting her but he told her it was too late.  She managed to wiggle from her coat, but then Wallace began to use the coat to cover her face and suffocate her with it.  During this stage of the fight, Wallace held Cohagen's hands behind her back at such a painful angle that she felt her shoulders

No. 16AP-145

might come out of joint. At some juncture he attempted to bind her with a telephone charging cord and also tried to put it around her neck. Toward the end of the fight, Wallace told her she was not going to be allowed to leave for 48 hours, and insisted that she "Army crawl" her way into the bathroom so he could waterboard her. (Tr. Vol. 1 at 124.) However, as she was crawling toward the bathroom, there came a knock at the door.

{¶ 9} Initially Wallace told Cohagen to answer it but he warned her that if she said anything he would kill her. However, Cohagen pointed out that her hair was a mess and asked leave to go fix it before answering. Wallace told her to fix her hair and went to answer the door himself. While Wallace was occupied, Cohagen ran to the bedroom to attempt to escape through the sliding glass door that opened into the back yard. However, the sliding door had a lock rod in the track and as Cohagen struggled to remove it, Wallace returned, grabbed her, and threw her on the bed.

{¶ 10} But the knock on the door had apparently been a neighbor attempting to return the dog, which had evidently escaped the house when Cohagen first opened the door before realizing she was not wearing shoes. That same neighbor, with dog in tow, now stood in the backyard. Reasoning that Wallace would not do anything with an observer looking through the sliding glass door, Cohagen unlocked the door and, without taking her purse, phone, or even shoes, fled. The entire interaction between Wallace and Cohagen lasted perhaps 45 minutes.

{¶ 11} Initially Cohagen hysterically tried to tell the neighbor in the backyard what had happened, but he seemed unprepared to understand her panicky explanation. Then, in the midst of her attempted explanation she turned, saw Wallace still standing in the bedroom, and she ran. This time she ran farther away in the apartment complex and found another neighbor, Courtney Stroud, who was near her car with the engine running to warm it up before driving it to do some Christmas shopping. After Cohagen knocked on the car window and explained herself, Stroud agreed to drive Cohagen away from the complex and call the police.

{¶ 12} Stroud's testimony confirmed the interaction with Cohagen and the fact that Cohagen appeared very upset. During Stroud's testimony, tapes of calls made by Stroud to the police were played. During the tapes Cohagen can be heard in the background supplying information to Stroud about what happened. In the first call, Stroud tells the

police that Cohagen's boyfriend is named Kyle Wallace. In the second, Stroud explains that Cohagen "was being held hostage by her boyfriend. He was trying to kill her." (Tr. Vol. 1 at 40; State's Ex. 35B.) The audio recordings themselves were also introduced as exhibits at trial.

{¶ 13} Stroud did note, however, that although Cohagen was barefoot and had a little redness around her neck, she saw no wounds or physical signs that Cohagen had been assaulted. In addition, all three times Stroud asked Cohagen on behalf of the 911 dispatcher if Cohagen wanted an ambulance, Cohagen refused.[1]

{¶ 14} A Columbus police officer testified he did not see any ripped clothing, wounds, or visible injuries that would have indicated an assault had taken place when he spoke to Cohagen. A Columbus police detective made a similar observation about Cohagen's appearance. In addition, the detective interviewed Wallace on the day of the incident and made a corresponding observation, that Wallace too had no visible marks, bruises, abrasions, lacerations, or other signs that he was involved in a struggle. In addition, the detective noted that when he inspected the apartment where the struggle had occurred, he documented some signs of disarray in photographs but found the bathtub (where the waterboarding would presumably have been intended to take place) to be dry.

{¶ 15} The emergency room doctor who saw Cohagen on the day of the incident also testified and provided more detail about Cohagen's physical health. He testified that he observed superficial abrasions and erythema (redness) around Cohagen's neck and chest consistent with having been strangled but noted that such marks could also have been from the cervical collar paramedics put on Cohagen when they transported her to the hospital. The doctor testified that there was no sign of damage to Cohagen's throat, no bleeding in the whites of her eyes (subconjunctival hemorrhages), or breaking of capillaries underneath the eye (conjunctival hemorrhages). Cohagen's neck was supple with no evidence of stiffness. Both CT and x-ray scans of Cohagen's neck and head read normally. He noted no bruising to her ribs, ribcage, or back but did note mild erythema and swelling of the left zygoma (cheekbone). He also testified that unconsciousness can be achieved by strangulation which compresses the blood vessels without fracturing the

---

[1] Although later, when being interviewed at the apartment, Cohagen acceded to the offer of medical attention and was transported by ambulance to Doctors West Hospital.

hyoid bone or producing swollen cartilage and that Cohagen's physical presentation was consistent with that possibility.

{¶ 16} The jury found Wallace not guilty of attempted murder but guilty of both felonious assault and kidnapping. The trial court merged the offenses of felonious assault and kidnapping and the State elected to convict and sentence on kidnapping. Thus, during a sentencing hearing on February 9, 2016, the trial court sentenced Wallace to eight years in prison for kidnapping and memorialized the sentence by judgment entry filed on February 10, 2016.

{¶ 17} Wallace now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 18} Wallace assigns a single error for our review:

> I. THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. DISCUSSION

{¶ 19} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 20} Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v.*

No. 16AP-145

*Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 21} By contrast:

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.)  *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594.  In manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

## A. Sufficiency

{¶ 22} The Ohio Revised Code defines kidnapping in part according to one of the following alternative definitions:

> (A) No person, by force[ or] threat * * * shall * * * restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;
>
> * * *
>
> (B) No person, by force[ or] threat * * * shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim * * * :
>
> * * *
>
> (2) Restrain another of the other person's liberty.

R.C. 2905.01(A)(3) and (B)(2).

No. 16AP-145

{¶ 23} Several courts have recognized that "terrorize" is not a legal term defined in the Ohio Revised Code. *See State v. Leasure*, 6th Dist. No. L-02-1207, 2003-Ohio-3987, ¶ 47 (citing cases). In common usage it means "[t]o fill or inspire (a person, nation, etc.) with terror, reduce to a state of terror; to torment." *Oxford English Dictionary*, www.oedonline.com. (OED Online Ed.2016). "Serious physical harm to persons" is defined in the Ohio Revised Code as:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(a) through (e).

{¶ 24} According to Cohagen's testimony, she and Wallace argued about whether he could use her cell phone. In the course of that argument Wallace said, "[y]ou have one or two options. Either you give me your phone or I am going to put your head through the wall." (Tr. Vol. 1 at 106.) When Cohagen remonstrated Wallace saying, "I don't know who you're talking to like that," Wallace became enraged, grabbed her, wrestled her to the ground, and "wouldn't let [her] go." (Tr. Vol. 1 at 108.) Thereafter, for approximately 45 minutes, according to Cohagen's reckoning, Wallace restrained her and hurt her in a variety of ways including strangulation to the point of unconsciousness. In addition, Cohagen testified that Wallace was in the process of making her crawl to the bathroom where he was going to waterboard her when a knock at the door interrupted him. Only by the intervention of a neighbor was Cohagen able to escape. This is sufficient evidence for the jury to find that Wallace restrained her by force with the intention of terrorizing her. R.C. 2905.01(A)(3). Thus, whether such testimony is also sufficient evidence of serious

No. 16AP-145

physical harm or risk of serious physical harm as contemplated in other parts of the kidnapping statute is a question we need not answer because there was sufficient evidence of an intent to terrorize.

### B. Manifest Weight

{¶ 25} Neither the first responders nor the treating physician noted any significant injuries to Cohagen. Even the witness, Stroud, who helped Cohagen flee the apartments immediately following the attack, did not notice any wounds or physical signs that she had been assaulted other than some mild redness around the neck. In addition, all three times Stroud asked Cohagen on behalf of the 911 dispatcher if Cohagen wanted an ambulance, Cohagen refused (until she was actually seen by law enforcement personnel). The treating physician testified that unconsciousness can be achieved by strangulation that compresses the blood vessels without fracturing the hyoid bone or without producing swollen cartilage, and Cohagen's physical presentation was consistent with that possibility. In short, the absence of more clear signs of physical injury neither definitively ruled out nor confirmed Cohagen's recitation of how events transpired. Thus, the issue of manifest weight analysis resolves to whether Cohagen was credible.

{¶ 26} The defense presented some evidence that Cohagen's grades were declining at ITT Technical Institute the semester before the incident as perhaps suggestive that Cohagen and Wallace were having some difficulty. In addition, a detective who investigated the case was permitted to testify that some unidentified witnesses had told him that Wallace was moving out on the day of the assault. But other than those facts and the lack of physical evidence to confirm that the assault had occurred as Cohagen testified, the jury was given little reason to doubt Cohagen's testimony. The record indicates that she was not impeached on any significant point of her testimony. She did not have a criminal record. Nothing any witness said contradicted what she said and no alternative evidence-based narrative was offered that the day unfolded any differently than to what she testified or as to why Cohagen ended up in Stroud's car on December 23, 2014 with no shoes, tears running down her face, and a red neck. We cannot conclude under these circumstances that the jury lost its way in reaching a guilty verdict.

## IV. CONCLUSION

{¶ 27} The evidence supporting the conviction was sufficient and the verdict was not contrary to the manifest weight of the evidence. We, therefore, overrule Wallace's sole

No. 16AP-145

assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and TYACK, J., concur.

———————————