[Cite as *State v. Pace*, 2025-Ohio-2874.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | Nos. 24AP-560 & 24AP-561 (C.P.C. No. 21CR-4649) |
| v. | : | |
| Tony L. Pace, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 14, 2025

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

APPEALS from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} In these consolidated appeals, defendant-appellant, Tony L. Pace, appeals from a judgment of the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding appellant guilty of kidnapping and not guilty of rape, and the trial court separately found him guilty of domestic violence.

**I. Facts and Procedural History**

{¶ 2} On November 5, 2021, appellant was indicted in Franklin C.P. No. 21CR-4649 on one count of kidnapping, in violation of R.C. 2905.01, one count of domestic violence, in violation of R.C. 2919.25, and one count of rape, in violation of R.C. 2907.02. By entry filed May 9, 2024, appellant elected to waive his right to a jury trial as to Count 2 of the indictment (domestic violence), and proceeded to a jury trial on the remaining two

counts. The trial court granted plaintiff-appellee State of Ohio's request to renumber the counts for ease of jury consideration.

{¶ 3} The kidnapping and rape charges came for trial before a jury beginning May 7, 2024. The first witness for the state was K.D., age 34. K.D. has five children, and appellant is the father of K.D.'s three youngest children (ages 3, 5, and 6). K.D. and appellant began dating in 2017 and lived together for five years. Their last residence was a "one-story ranch style house" located on Midway Avenue, Columbus, which they rented. (Tr. Vol. 2 at 136.)

{¶ 4} In October 2020, K.D.'s relationship with appellant was "[r]ocky." (Tr. Vol. 2 at 138.) The two had argued about K.D. "wanting to leave" the relationship, and, at the time, appellant "was sleeping either in the front room on the couch or he would go in one of the kids' rooms and make a pallet on the floor." (Tr. Vol. 2 at 139.) K.D. testified she "would sleep in [her] room with the door shut." (Tr. Vol. 2 at 139.)

{¶ 5} On October 9, 2020, K.D. was at work until 8:00 p.m. Appellant drove her to work that day and later picked her up at her workplace. K.D. "[m]ade plans" with her friends, including her best friend, S.C., "to go out and have drinks." (Tr. Vol. 2 at 140.) Appellant also made separate plans that evening to "[g]o with his friends." (Tr. Vol. 2 at 141.) Appellant and K.D. drove home, "gathered the kids and dropped them off and then came back home to get dressed." (Tr. Vol. 2 at 140.)

{¶ 6} At approximately 9:00 p.m., K.D. took appellant's car to meet her friend S.C. A short time later, appellant called K.D., and he was "going off about him wanting his car back." (Tr. Vol. 2 at 142.) Appellant "was accusing [K.D.] of being with somebody else because he heard people in [the] background." (Tr. Vol. 2 at 142.) K.D. "told him that he could pull up and get his car, but [she] didn't give him the exact location where [she] was." (Tr. Vol. 2 at 143.) Appellant "pulled up on the corner" and they "switched cars." (Tr. Vol. 2 at 143.) K.D. testified that appellant then "called multiple times threatening [her], accusing [her] of being with somebody else." (Tr. Vol. 2 at 143.) K.D. denied being with another man that night.

{¶ 7} K.D. and her friends had drinks and smoked marijuana that evening. K.D. "stayed for a while with [her] friend," but then "decided to go home because [she] had started getting phone calls again" from appellant. (Tr. Vol. 2 at 144.) K.D. returned home

"[a] little later than midnight" but realized she was "locked out." (Tr. Vol. 2 at 145.) She called her "best friend," who had a spare key, "to come let [her] in." (Tr. Vol. 2 at 145.) K.D. testified that appellant "started calling [her] to check and see if [she] was at home, and then he was . . . cussing [her] out about being outside." (Tr. Vol. 2 at 146.)

{¶ 8} Appellant "hung up" on her, "and moments later he walked in the house and got in the shower and then left" the residence. (Tr. Vol. 2 at 146.) K.D. related that appellant then "calls [her] on FaceTime, and he is going off about why didn't [she] say nothing to him for coming in the house in the middle of the night, getting in the shower, and then leaving . . . [a]nd then he is accusing [her] of not loving him and cheating on him." (Tr. Vol. 2 at 147.)

{¶ 9} K.D. stated appellant then returned to the residence "and he walks in the room, and he is still going off about why [she's] not saying nothing to him. . . And he catches [her] recording him, and he slaps [her] and [they] instantly start fighting." (Tr. Vol. 2 at 147.) K.D. set her "phone on record" because she "felt like he was going to do something to [her]." (Tr. Vol. 2 at 148.) Appellant "snatched" K.D.'s phone and slapped her "[a]cross [her] face." (Tr. Vol. 2 at 148.)

{¶ 10} K.D. told appellant she did not "want to be with him anymore and for him to get out, that [she] was tired of him." (Tr. Vol. 2 at 148.) K.D. testified: "He started to choke [her] around until [she] passed out. Every time [she] passed out, [she] woke up in a different spot of the house or the room [she] was in." (Tr. Vol. 2 at 148.) Appellant was also "punching [her] . . . spitting on [her] . . . kicking [her]." (Tr. Vol. 2 at 149.) K.D. stated the conduct occurred in "[d]ifferent areas" of the residence. (Tr. Vol. 2 at 149.)

{¶ 11} K.D. was "trying to use anything that is around [her] or near [her] to defend [herself]." (Tr. Vol. 2 at 149-50.) The physical assault went on for "[h]ours." (Tr. Vol. 2 at 150.) K.D. testified: "In between the breaks, he would apologize to [her] for putting his hands on [her]." (Tr. Vol. 2 at 150.) Appellant "would be apologizing to [her] and then no more than 30 seconds later, he would be saying that he is not leaving until the police comes, and then he would go back to abusing [her]." (Tr. Vol. 2 at 150.) K.D. did not call the police because appellant "wouldn't let [her]." (Tr. Vol. 2 at 151.)

{¶ 12} K.D. related that, "after the last time I remember waking up, coming to, I am in the hallway, and I get up and I proceed to walk to the bathroom to run some bath water.

And he goes in the bathroom and sits on the toilet while I run the bath water, and he is apologizing to me." (Tr. Vol. 2 at 151.) K.D. "got scared" and turned off the water, and then "walked out the bathroom." (Tr. Vol. 2 at 151.)

{¶ 13} K.D. further testified: "[Appellant] is telling me to go to the room, so I proceeded to walk towards the room. When I got in the room, he told me to bend over the bed. I bent over the bed, and then he holds me down with his arm, and he proceeds to stick his penis in my vagina. I'm crying, and he looks over me, and then he tells me that I wanted this to happen. And then he just stops." (Tr. Vol. 2 at 151.)

{¶ 14} Appellant "pushed [K.D.] back over the bed, and then . . . makes [her] get up on the bed." (Tr. Vol. 2 at 152.) Appellant lit up "a blunt" and told K.D. to smoke it; when she declined, he "hit[]" her, so she "grabbed it and . . . smoked it." (Tr. Vol. 2 at 152.) K.D. further testified: "Then he tells me to turn over on my stomach, so I turned over on my stomach. And he climbed on top of me, and he took my arms behind my back as he sat on my legs and he forced his penis in my anal. I began to scream and try to fight him off of me, and he kept telling me to shut up, and then he started choking me with a belt." (Tr. Vol. 2 at 152.) K.D. described the belt as "dark-colored." (Tr. Vol. 2 at 152.)

{¶ 15} K.D. stated she was "[t]rying to breathe, and . . . trying to fight him off of me." (Tr. Vol. 2 at 153.) K.D. testified: "I start . . . squeezing my booty cheeks together because it hurt and he started to stab me with a pair of scissors. . . He is plunging the scissors into my body, and he is telling me to shut up. . . And every time I screamed, he would pull the belt and he would take his arm to put it over my mouth, and muffle me." (Tr. Vol. 2 at 153.)

{¶ 16} Appellant then "jumps off" of her and walks "towards the bathroom," and K.D. "heard the bathroom door shut." (Tr. Vol. 2 at 154.) K.D. then "opened up the [bedroom] window." (Tr. Vol. 2 at 154.) K.D. testified: "[H]e heard me open the window, so he ran back in the room. And as I'm jumping out the window, I get stuck because my screen is in my window, so I began to just dive out of the window head first." (Tr. Vol. 2 at 154.) K.D. further testified: "[T]he screen broke out the window, and I fell, but I caught onto a bush on my house. And he caught my leg, so I have two arms and a leg outside of my house hanging by one leg because he caught my other leg. And he is telling me that he is going to F me up if he gets me back in the house." (Tr. Vol. 2 at 154.) K.D. was screaming

for help, and her neighbors "opened up the front door, and they just kept looking around." (Tr. Vol. 2 at 155.) Appellant then "starts biting me on my legs." (Tr. Vol. 2 at 155.)

{¶ 17} K.D. "screamed as hard as [she] could for help," and the neighbors "called [her] name" and "came across the street." (Tr. Vol. 2 at 155.) The neighbors "stood in the middle of [her] yard and they yelled for [appellant] to put [her] down and let [her] go. He wouldn't let [her] go. And they literally had to argue with him for him to let [her] go." (Tr. Vol. 2 at 155.) K.D. related she then "dropped to the ground . . . [a]nd . . . just fell," and the neighbors "ran up to me and grabbed me and gave me a robe because I was naked and walked me across the street so I could call the police." (Tr. Vol. 2 at 155.) After placing the call, police officers arrived and K.D. was taken to a hospital for an examination. K.D. described her injuries as "cuts and scrapes and bruises everywhere," and her "foot was broke[n]." (Tr. Vol. 2 at 162.)

{¶ 18} At trial, the state played a recording of the call placed by K.D., admitted as state's exhibit C2. K.D. also identified at trial various photographs of the residence. K.D. identified state's exhibit C13 as depicting the "pair of scissors he used to stab [her] with." (Tr. Vol. 2 at 159.) She also identified an exhibit as depicting "[t]he belt that was used to choke [her]." (Tr. Vol. 2 at 160.)

{¶ 19} K.D. did not see appellant following the incident. He would "call very often," and "would try to get [her] to drop the charges and complain to [her] about having to go to jail for a long time and [she] was messing up his life." (Tr. Vol. 2 at 163.) K.D. testified that none of the sexual conduct was consensual.

{¶ 20} On cross-examination, K.D. stated that she and appellant had lived together for five years prior to the incident. K.D. stated the assaultive behavior inside the residence took place "[e]verywhere," including the front room, the hallway, the bedroom, the bathroom, and the children's rooms. (Tr. Vol. 2 at 189.)

{¶ 21} On October 10, 2020, Columbus Police Officer William Frease was dispatched to a residence on Midway Avenue. He observed a female outside, wearing a robe, and "[s]he explained to me what had occurred during that . . . period of time involving the incident." (Tr. Vol. 2 at 201.) The woman was walking with a "limp," and the officer also "noticed a little laceration on one of her arms." (Tr. Vol. 2 at 201.) The officer testified: "I don't think she had anything else on underneath that robe. I think she stated to me that

when she was fleeing the residence, she went to a neighbor's and they gave her a robe to wear." (Tr. Vol. 2 at 201.)  Based on his conversation with her, the officer stated he was required "to contact our sexual abuse squad." (Tr. Vol. 2 at 202.)  Medics arrived and the woman was transported to Grant Hospital.  No other individuals or potential suspects were located at the residence.

{¶ 22}  On October 10, 2020, Columbus Police Detective James Long, a member of the department's crime scene search unit, was dispatched to Grant Hospital to interview K.D.  He was accompanied by Detective Aaron Mall.  After speaking with K.D., the detectives went to K.D.'s residence on Midway Avenue, and took photographs of the residence, admitted at trial as state's exhibits C1 through C34.  Detective Long identified state's exhibit C4 as a photograph of "the bedroom window that the victim stated she climbed out of during the assault," and he noted "the screen was knocked down on the ground." (Tr. Vol. 2 at 217.)  The detectives collected two belts from the residence, as well as a pair of scissors found on the floor of the living room.  At trial, Detective Long identified state's exhibit D4 as a black belt and state's exhibit D5 as a "pair of scissors." (Tr. Vol. 2 at 227.)  A second belt collected at the residence was multi-colored.

{¶ 23}  Detective Long testified that DNA testing is not conducted in every case.  As part of the investigation, detectives spoke to "two witnesses that lived across the street from the residence." (Tr. Vol. 2 at 228.)  These neighbors "had a video doorbell," and "[t]hey heard the screaming and commotion and they came outside to help the victim, and . . . their video Ring doorbell picked up her climbing out the window and running across the street to them." (Tr. Vol. 2 at 229.) Detective Long was able to watch the video, but he was unable to obtain a copy of it.

{¶ 24}  At the hospital, a "SANE kit" was completed and Detective Long collected the kit and turned it into the property room. (Tr. Vol. 2 at 229.)  Detective Long testified appellant was arrested "almost two years" after the incident. (Tr. Vol. 2 at 231.)  A DNA swab was collected from appellant following his arrest.

{¶ 25}   Sheree Ford is a licensed nurse, and is also trained as a sexual assault nurse examiner ("SANE"); she currently serves as a forensic nurse coordinator with OhioHealth.  On October 10, 2020, shortly before 1:30 p.m., Ford conducted an examination of K.D. "in the emergency department at Grant Medical Center downtown in Columbus." (Tr. Vol. 2

at 270.) At trial, Ford identified state's exhibit E as the "forensic exam note[s]" she made during that examination. (Tr. Vol. 2 at 269.)

{¶ 26} K.D. reported to Ford "that she had been sexually assaulted by Mr. Tony Pace," and that "she had been physically assaulted as well as strangled several times." (Tr. Vol. 2 at 272.) The "sexual assault she reported was anal and vaginally," and K.D. indicated she "was in a lot of pain." (Tr. Vol. 2 at 272.) During her testimony, Ford read into the record the statement K.D. provided her, in which K.D. reported that appellant choked and punched her, that he put a belt around her neck, and that she had been cut by scissors on her right forearm.

{¶ 27} At trial, Ford identified state's exhibit F as the "Ohio Sexual Assault Evidence Collection Kit." (Tr. Vol. 2 at 299.) She identified state's exhibits H1 through H54 as photographs taken of K.D. at the time of the examination. Ford stated that outward signs of strangulation are rare. K.D. reported "that her neck was sore." (Tr. Vol. 2 at 284.) Ford testified that several photographs indicated "evidence of petechiae" in K.D.'s left eye, which Ford described as "small pinpoint injuries that are caused from pressure around the neck" when blood flow to the neck is "close[d] off." (Tr. Vol. 2 at 285.) Ford also noted "possibly some petechiae" of the right eye. (Tr. Vol. 2 at 286.)

{¶ 28} Ford identified state's exhibit H19 as a photograph depicting "a small bruised area . . . on the left upper arm." (Tr. Vol. 2 at 287.) Ford noted K.D. "had a lot of difficulty actually . . . raising her [left] arm" and cited "eight out of ten pain with movement." (Tr. Vol. 2 at 288.) K.D.'s voice was "hoarse and raspy." (Tr. Vol. 2 at 288.) K.D.'s right forearm had "a long, linear abrasion . . . where she states that she was cut with the scissors." (Tr. Vol. 2 at 288.) Ford stated there was "dried blood" on K.D.'s forearm. (Tr. Vol. 2 at 289.)

{¶ 29} Ford noted several abrasions on K.D.'s left hip and left thigh, and stated that K.D.'s "right thigh is significantly more swollen than the left thigh." (Tr. Vol. 2 at 292.) Ford also noted an abrasion on K.D.'s "right lower leg, the shin area." (Tr. Vol. 2 at 293.) K.D. complained of "severe pain" to her "right great toe." (Tr. Vol. 2 at 293.) An x-ray of K.D.'s foot indicated she "did have a fracture to [her] right big toe." (Tr. Vol. 2 at 304.)

{¶ 30} Ford also conducted an internal examination on K.D. K.D. "had a lot of tenderness on her anogenital exam, both to the anus and the vagina." (Tr. Vol. 2 at 294-

95.) Ford, who noted no injuries to the vagina, testified the lack of observable injuries does not mean a sexual assault did not occur.

{¶ 31} Miranda Smith, a forensic scientist in the DNA section of the Columbus Police crime laboratory, performed testing on the sexual assault kit collected during K.D.'s examination. At trial, Smith identified state's exhibit J1 as a report generated following crime lab testing. Smith testified that swabs taken of the neck, thigh, right arm, and palms of the hands "did not have sufficient DNA" to conduct further testing. (Tr. Vol. 3 at 361.) She stated there was sufficient DNA for the "internal vaginal swabs." (Tr. Vol. 3 at 364.) Specifically, "the DNA profile from the internal vaginal swabs is interpreted as being a mixture of two individuals including an unknown male contributor." (Tr. Vol. 3 at 365.)

{¶ 32} In April 2022, the laboratory received "a DNA standard from Tony Pace for comparison to the unknown male profile" and Smith prepared a report. (State's Ex. J2.) (Tr. Vol. 3 at 368.) Smith testified "the DNA profile obtained from the sperm fraction of the vaginal swabs is interpreted as a mixture of two individuals," and "Tony Pace and [K.D.] cannot be excluded as contributors to this profile." (Tr. Vol. 3 at 371.) According to Smith, the analysis "essentially . . . is providing support that Tony Pace is a contributor to that profile." (Tr. Vol. 3 at 371-72.) In April 2023, Smith prepared another report after being "asked to go back and do the perianal swabs." (Tr. Vol. 3 at 373.) Smith stated that Y-STR testing indicated the male profile from the perianal swab was consistent with appellant's profile.

{¶ 33} At trial, the parties stipulated appellant had "three prior convictions for domestic violence involving victims who were family or household members at the time of the commissions of the violations." (Tr. Vol. 3 at 396.) At the close of the state's case-in-chief, the defense made a Crim.R. 29 motion for acquittal which the trial court denied.

{¶ 34} Appellant testified on his own behalf. At the time of the events, he "was selling marijuana" for a living, and had been selling marijuana "[p]retty much all [of his] life." (Tr. Vol. 3 at 407.) Appellant acknowledged he had theft convictions.

{¶ 35} Appellant met K.D. in 2015 or 2016, and acknowledged their relationship was rocky in 2020. When asked about K.D.'s testimony that he believed she was cheating, appellant responded: "I didn't care about nobody cheating. I just wanted to make my money, that's it. That's all." (Tr. Vol. 3 at 410.)

{¶ 36} Appellant provided the following testimony regarding the events beginning on the evening of October 9, 2020. At approximately 9:30 p.m., appellant "picked [K.D.] up from her job," and K.D. "asked me can she use my truck," and "I was like . . . I got people coming from out of town to come and buy some weed." (Tr. Vol. 3 at 411.) Appellant stated: "So she started arguing with me. And I am like, Man, look, I'm tired of arguing. I'm just going to go ahead and let you get my truck." (Tr. Vol. 3 at 411.) Later, appellant was talking to K.D. on the phone and "she start talking crazy," and "I said . . . you won't be talking crazy when you be spending this money." (Tr. Vol. 3 at 413.) Appellant testified: "[S]he wouldn't come, so I had to call my boy Hassan [who] had to come all the way out west, take me to Sycamore and 22nd. She drives my car out . . . in the middle of the road. I jumped out [of] Hassan's truck, get in my truck and pull off and go handle what I got to handle." (Tr. Vol. 3 at 414.) Appellant then "went to go sell some pounds of weed." (Tr. Vol. 3 at 416.)

{¶ 37} After getting his money, appellant returned to K.D.'s residence around 2:00 or 2:30 a.m. Appellant testified: "When I got back there, I ain't say nothing to her. I walked in . . . I just walked right past her. Jumped in the shower . . . Put some clothes on. Didn't say nothing to her. Walked out the house and jumped in my truck and pulled off." (Tr. Vol. 3 at 417.) Appellant "was about to go to my boy Marshawn's house to smoke a couple blunts and play video games." (Tr. Vol. 3 at 418.)

{¶ 38} Appellant stated he received a call from K.D. and "[w]e made up. I thought that we was done. That's why I came back." (Tr. Vol. 3 at 420.) Appellant then turned around and drove back to K.D.'s residence. Appellant testified: "So I get back to the house . . . and . . . I thought we was making love." (Tr. Vol. 3 at 421.) Appellant stated they had vaginal intercourse and he ejaculated, and they then discussed "anal." (Tr. Vol. 3 at 421.) Appellant testified "I really couldn't do nothing after that. It was, like, over, and she just got mad. She got pissed off about that." (Tr. Vol. 3 at 422.)

{¶ 39} Appellant testified they argued "[a]t least for 30, 45 minutes." (Tr. Vol. 3 at 423.) Appellant stated he did not "feel like arguing," and he "just went ahead and la[id] down and went to sleep." (Tr. Vol. 3 at 424.) Appellant denied threatening K.D. with scissors and denied placing any belts around her neck. Later that morning, a client called "for some weed," and appellant "got up, got dressed, weighed the stuff out, and went on about my business." (Tr. Vol. 3 at 424.)

{¶ 40} Appellant stated he first became aware the police had been called "when the neighbors called me and told me, Man, there was police all in your house." (Tr. Vol. 3 at 425.) Appellant testified he tried to call K.D. but she would not answer. He "tried to go over there" and, at the time, "didn't see no police at my house." (Tr. Vol. 3 at 426.) He "got a couple of [his] items and . . . went ahead and left." (Tr. Vol. 3 at 426.) Appellant contacted his aunt in Indianapolis, "[a]nd she told [him], Yeah, come on down here." (Tr. Vol. 3 at 427.) Appellant "kind of figured . . . [he] had to make . . . some money to get . . . a lawyer and [he] was going to turn myself in." (Tr. Vol. 3 at 427.) Appellant further testified: "So the day I had the money in my hand, I pulled the $20,000 out to buy some weed . . . from somebody, and they shot me up nine times, and I couldn't make it. . . I couldn't turn myself in because I got shot up so many times." (Tr. Vol. 3 at 427.)

{¶ 41} On cross-examination, appellant stated he had 15 children, and that his youngest child with K.D. was born two months before the incident. When asked about photographs depicting injuries to K.D., appellant stated: "I really don't know how that got there. I am a big guy. If I done all of that stuff to her, it would be more bruises on her than that. I'm a big guy." (Tr. Vol. 3 at 447.) When asked whether K.D. had those injuries prior to that evening, appellant responded: "I don't know. I don't think so. I don't know." (Tr. Vol. 3 at 448.) Appellant did not know if the screen on the window was broken before he arrived at the residence that evening. Appellant stated that "most of the time . . . I be high on marijuana . . . I really don't be paying attention to that surrounding stuff like that." (Tr. Vol. 3 at 447.)

{¶ 42} Following deliberations, the jury returned verdicts finding appellant guilty of kidnapping and not guilty of rape. The trial court separately found appellant guilty of domestic violence. By judgment entry filed August 2, 2024, the court sentenced appellant to an indefinite minimum mandatory term of 5 years as to the kidnapping count, and 36 months as to the domestic violence count, with the sentences to run concurrently. The court filed amended judgment entries on August 9 and September 24, 2024.

## II. Assignments of Error

{¶ 43} Appellant appeals and assigns the following two assignments of error for our review:

> [I.] The trial court erred when it denied Mr. Tony L. Pace 29
> Motion for Acquittal.

[II.] The verdicts of guilt as to the convictions of Kidnapping, and Domestic Violence.

## III. Discussion

{¶ 44} Appellant's assignments of error are interrelated and will be considered together. Under the first assignment of error, appellant challenges the sufficiency of the evidence as to his convictions for kidnapping and domestic violence, and asserts the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal. Under his second assignment of error, appellant contends the verdicts were against the manifest weight of the evidence.

{¶ 45} Crim.R. 29(A) provides in part: "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." This court applies "the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence." *State v. Hernandez*, 2009-Ohio-5128, ¶ 6 (10th Dist.), citing *State v. Turner*, 2004-Ohio-6609, ¶ 8 (10th Dist.), citing *State v. Ready*, 143 Ohio App.3d 748, 759 (11th Dist. 2001).

{¶ 46} Under Ohio law, "[t]he legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations." *State v. M.L.D.*, 2016-Ohio-1238, ¶ 45 (10th Dist.). In reviewing a sufficiency challenge, "we construe the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 47} By contrast to a sufficiency of the evidence challenge, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at ¶ 8, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A reviewing court "should reverse a conviction as against the manifest weight of the evidence in only the most 'exceptional case in which the evidence weighs heavily against conviction,' instances in which the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 48} The jury in this case found appellant guilty of kidnapping under R.C. 2905.01(A)(3), which provides in part: "No person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, for . . . the . . . purpose[] [t]o terrorize, or to inflict serious physical harm on the victim or another."

{¶ 49} R.C. 2901.01(A)(1) defines "force" to mean "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." The Supreme Court of Ohio "has defined 'threat' to include 'a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm.' " *State v. Young*, 2013-Ohio-1247, ¶ 20 (10th Dist.), quoting *State v. Cress*, 2006-Ohio-6501, ¶ 39. While "[s]everal courts have recognized that 'terrorize' is not a legal term defined in the Ohio Revised Code," in its "common usage," the word "means '[t]o fill or inspire (a person, nation, etc.) with terror, reduce to a state of terror; to torment.' " *State v. Wallace*, 2016-Ohio-7013, ¶ 23 (10th Dist.), quoting *Oxford English Dictionary*, *www.oedonline.com* (OED Online Ed.2016).

{¶ 50} Pursuant to R.C. 2901.01(A)(5), the term " '[s]erious physical harm to persons' " is defined to mean any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 51} R.C. 2919.25 defines the offense of domestic violence, and R.C. 2919.25(A) states: "No person shall knowingly cause or attempt to cause physical harm to a family or

household member." Under Ohio law, "[t]he term 'physical harm' in the domestic violence statute is defined in R.C. 2901.01(A)(3) as 'any injury, illness, or other physiological impairment, regardless of its gravity or duration.' " *State v. Ford*, 2020-Ohio-4298, ¶ 17 (8th Dist.), quoting R.C. 2901.01(A)(3). Further, "if the offender has been twice or more convicted of domestic violence or similar offenses, R.C. 2919.25(D)(4) requires that a new conviction of the offense is no longer a first-degree misdemeanor but a third-degree felony." *State v. Houston*, 2017-Ohio-1122, ¶ 18 (10th Dist.), citing R.C. 2919.25(D)(2) and (4).

{¶ 52} We initially address appellant's challenges to the sufficiency and weight of the evidence supporting his kidnapping conviction. With respect to his sufficiency argument, appellant asserts the state "failed to demonstrate that [he] employed force, threat, or deception in any way that would remove or restrain [K.D.'s] liberty." (Appellant's Brief at 14.) Appellant also contends there was insufficient evidence to suggest he had the intent to terrorize or cause serious physical harm to K.D. According to appellant, he denied the allegations by K.D. and maintains there is a lack of direct physical evidence or corroborating testimony to support K.D.'s testimony.

{¶ 53} In considering appellant's sufficiency challenge to the kidnapping verdict, the record indicates the following evidence presented by the prosecution at trial. The state's primary witness, K.D., stated that her relationship with appellant in October 2020 was "[r]ocky." (Tr. Vol. 2 at 138.) On the evening of October 9, 2020, K.D. and appellant made separate plans to spend the evening with friends. K.D. eventually returned to their residence after appellant had called her multiple times accusing her of being with someone else.

{¶ 54} Appellant later arrived at the residence, took a shower, and left. He returned a short time later, and they started to argue. K.D. began recording appellant on her phone, and appellant grabbed the phone and slapped her across the face. When K.D. told appellant she did not want to be with him anymore, appellant "started to choke [her] until [she] passed out." (Tr. Vol. 2 at 148.) K.D. testified she "woke up in a different spot of the house or the room [she] was in." (Tr. Vol. 2 at 148.) Appellant was punching, spitting and kicking K.D., and K.D. was "trying to use anything . . . around [her] or near [her] to defend [herself]." (Tr. Vol. 2 at 149-50.)

{¶ 55} K.D. testified that, in between fights, appellant would "apologize to [her] for putting his hands on [her]," but then "he would go back to abusing [her]." (Tr. Vol. 2 at 150.) According to K.D., she could not call police because he had taken her phone and "[h]e wouldn't let [her]." (Tr. Vol. 2 at 151.) The last time K.D. "remember[ed] waking up," she went to the bathroom and began to run bath water. (Tr. Vol. 2 at 151.) When appellant came into the bathroom, K.D. "got scared" and turned off the water. (Tr. Vol. 2 at 151.)

{¶ 56} K.D. testified appellant told her to "go to the room," and after telling her to bend over the bed, "he [held her] down with his arm, and he proceeds to stick his penis in [her] vagina." (Tr. Vol. 2 at 151.) Appellant then "pushed [K.D.] back over the bed," and made her "get up on the bed." (Tr. Vol. 2 at 152.) Appellant lit up "a blunt" and tried to get her to smoke it; appellant then "hit[]" her and told her "to smoke the weed." (Tr. Vol. 2 at 152.) Appellant told K.D. to "turn over on [her] stomach" and he "climbed on top of [her]." (Tr. Vol. 2 at 152.) K.D. testified that appellant "took [her] arms behind [her] back as he sat on [her] legs" and "forced his penis in [her] anal." (Tr. Vol. 2 at 152.) K.D. "began to scream and try to fight him off," and appellant "kept telling [her] to shut up," and he then "started choking [her] with a belt." (Tr. Vol. 2 at 152.) When K.D. continued to resist, appellant "started to stab [her] with a pair of scissors." (Tr. Vol. 2 at 153.)

{¶ 57} Appellant eventually got up and went into the bathroom. When K.D. "heard the bathroom door shut," she opened the bedroom window and attempted to jump out. (Tr. Vol. 2 at 154.) K.D. got "stuck" because of the window screen; the screen "broke out the window," but K.D. became "caught" on a bush. (Tr. Vol. 2 at 154.) Appellant heard K.D. open the window, and he "ran back in the room." (Tr. Vol. 2 at 154.) Appellant then grabbed K.D.'s leg and told her "he is going to F [her] up if he gets [her] back in the house." (Tr. Vol. 2 at 154.) Appellant began "biting [K.D.] on [her] legs." (Tr. Vol. 2 at 155.) K.D. was screaming for help, and two neighbors "yelled for [appellant] to put [K.D.] down and let [her] go." (Tr. Vol. 2 at 155.) K.D. reported to Ford, the SANE, that she "thought [she] was going to die at that point." (Tr. Vol. 2 at 279.) K.D. eventually fell to the ground, and the neighbors gave her a robe and walked her across the street to call police.

{¶ 58} Under Ohio law, "[k]idnapping does not depend on the distance a victim is removed or the manner the victim is restrained," but rather " 'it depends on whether the removal or restraint is such as to place the victim in the offender's power and beyond

immediate help, even though temporarily.' " *State v. Tatum*, 2001 Ohio App. LEXIS 810, *17 (Mar. 6, 2001), quoting 1974 Committee Comment to R.C. 2905.01.

{¶ 59} As set forth above, K.D. testified as to escalating conduct by appellant after he grabbed her phone and began to strike her, including testimony that appellant choked her with both hands to the point of unconsciousness, that he punched, kicked, and spat on her, and subsequently wrapped a belt around her neck and threatened her with scissors; K.D. stated this conduct occurred in different areas of the house as she tried to defend herself. K.D. testified that she was scared, and that appellant would not let her call police. When appellant momentarily left the bedroom and went into another room, K.D. attempted to flee the residence through a window; appellant, however, ran back into the bedroom and grabbed her by the leg, attempting to pull her back into the house and prevent her from escaping.

{¶ 60} Viewing the evidence in a light most favorable to the prosecution, the state presented evidence that, if believed, was legally sufficient for a reasonable jury to find that appellant, by force or threat, removed and/or restrained the liberty of K.D. for the purpose to terrorize and/or to inflict serious physical harm on her. *See*, *e.g.*, *Wallace*, 2016-Ohio-7013, at ¶ 24 (10th Dist.) (evidence that defendant restrained victim and "hurt her in a variety of ways including strangulation to the point of unconsciousness" sufficient evidence for jury to find defendant "restrained her by force with the intention of terrorizing her"); *Ohio v. Craig*, 2020-Ohio-3103, ¶ 29 (1st Dist.) ("[t]emporary loss of consciousness constitutes a temporary substantial incapacity, and, therefore, serious physical harm").

{¶ 61} We note, in addition to the testimony of K.D., the state presented medical evidence as to her injuries, including testimony by the forensic nurse that K.D. had "a long, linear abrasion" along her forearm, bruising to her left upper arm, abrasions to her right leg as well as a fracture to her right big toe. (Tr. Vol. 2 at 288.) Ford also noted evidence of petechiae in K.D.'s eyes, which Ford described as "small pinpoint injuries that are caused from pressure around the neck" when blood flow is cut off. (Tr. Vol. 2 at 285.) The state also submitted physical evidence collected at the scene, including two belts and a pair of scissors, and state's exhibit C-4 depicted the bedroom window screen lying on the ground outside the window. Here, while K.D.'s testimony alone, if believed, was sufficient to

support the conviction for kidnapping, we agree with the state that other medical and physical evidence lent support to her testimony.

{¶ 62} Accordingly, because the evidence was sufficient to support the elements of kidnapping, the trial court did not err in denying appellant's Crim.R. 29 motion for acquittal. Nor do we find the jury clearly lost its way and created a manifest miscarriage of justice such that the conviction for kidnapping must be reversed as against the manifest weight of the evidence. While appellant points to his own testimony as contradicting K.D.'s version, "the presence of conflicting testimony does not render a verdict against the manifest weight of the evidence." *State v. Scott*, 2019-Ohio-4175, ¶ 16 (10th Dist.), citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). Further, "as this court has stated, 'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.' " *Id.*, quoting *State v. Lipkins*, 2017-Ohio-4085, ¶ 39 (10th Dist.), citing *State v. Gale*, 2006-Ohio-1523, ¶ 19 (10th Dist.).

{¶ 63} We next consider appellant's claim that his conviction for domestic violence is against the sufficiency and manifest weight of the evidence. In his sufficiency challenge, appellant argues the state failed to show he knowingly caused or attempted to cause physical harm to K.D. We disagree.

{¶ 64} As noted, in order to convict appellant of domestic violence, the state was required to show that he "knowingly cause[d] or attempt[ed] to cause physical harm to a family or household member." R.C. 2919.25(A). Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." Further, "[i]n the absence of a defendant's admission, resolution of whether an individual acts knowingly must be determined from all the surrounding facts and circumstances." *State v. Watson*, 2018-Ohio-4964, ¶ 13 (10th Dist.), citing *State v. Fielding*, 2014-Ohio-3105, ¶ 51 (10th Dist.); *State v. Henry*, 2018-Ohio-1128, ¶ 51 (10th Dist.). Under R.C. 2901.01(A)(3), "[p]hysical harm to persons" is defined to mean "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

{¶ 65} Based on the evidence outlined above, the state presented sufficient evidence as to all elements of the offense. K.D. testified that she and appellant shared the residence

and had been together for five years, and appellant does not dispute K.D. was a household member. As set forth under the facts, K.D. testified that appellant punched, kicked, and choked her to the point of unconsciousness, and that he wrapped a belt around her neck and stabbed her with scissors. We have further noted, in addressing appellant's sufficiency challenge to the kidnapping count, the medical evidence presented as to K.D.'s injuries. The parties also stipulated appellant had at least two prior domestic violence convictions. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, the elements of domestic violence, i.e., that appellant knowingly caused or attempted to cause physical harm to a household member.

{¶ 66} Appellant essentially contends there were inconsistencies between K.D.'s testimony and other evidence, including inconsistencies regarding which vehicle she drove that evening, and whether she drove herself home or was driven home by a friend. Appellant points to his own testimony "that he did not threaten or assault [K.D.] and provided a plausible explanation for the circumstances." (Appellant's Brief at 21.) Ohio courts recognize, however, "[w]hether a witness's testimony should have been believed . . . is an issue of weight," and that "[i]n a sufficiency challenge, 'a victim's testimony alone can be sufficient to prove domestic violence.' " *State v. Swogger*, 2025-Ohio-1003, ¶ 11 (5th Dist.), citing *State v. Puchowicz*, 2024-Ohio-5766, ¶ 27 (11th Dist.).

{¶ 67} We also conclude appellant's conviction for domestic violence is not against the manifest weight of the evidence. As noted, the domestic violence count was tried to the court, and it is "well-established that the trial court in a bench trial is in the best position to determine the credibility of witnesses." *In re C.H.*, 2018-Ohio-3459, ¶ 19 (5th Dist.). In this respect, "the trial court, as the fact finder, is free to believe all, part, or none of the testimony of each witness." *Id.*, citing *State v. Caldwell*, 79 Ohio App.3d 667, 679 (4th Dist. 1992). In the present case, it was within the province of the trial court, as trier of fact, to assess the credibility of the witnesses, and it is clear the court credited the testimony of K.D. over that of appellant. Based on the record presented, the court did not clearly lose its way in resolving conflicts in the evidence and in finding appellant guilty of domestic violence.

{¶ 68} Accordingly, having found that appellant's convictions for kidnapping and domestic violence are supported by sufficient evidence and that such convictions are not

against the manifest weight of the evidence, appellant's first and second assignments of error are not well-taken and are overruled.

## IV. Conclusion

{¶ 69} Based upon the foregoing, and having overruled appellant's two assignments of error, the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DORRIAN and BOGGS, JJ., concur.

———————————